ARCHER & GREINER
A Professional Corporation
1025 Laurel Oak Road
Voorhees, NJ 08043
(856) 795-2121
Attorneys for Plaintiff
Delaware River Port Authority

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | |
|---|---|
| DELAWARE RIVER PORT AUTHORITY,<br><br>Plaintiff,<br><br>vs.<br><br>KEVIN D. WALSH, Acting New Jersey State Comptroller, in his official capacity,<br><br>Defendant. | **Civ. A. No. 3:24-cv-8186 (MAS-JTQ)** |

# PLAINTIFF'S BRIEF IN OPPOSITION TO MOTION TO DISMISS, AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT ON DECLARATORY JUDGMENT CLAIM

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ... ii

INTRODUCTION ... 1

A. As a Bi-State Entity, DRPA is Not Subject to Application of One Founder State's Law Without Legislative Consent from the Other Founder State. ... 1

B. The N.J. Statutory Subpoena Power Upon Which Defendant Relies is Inapplicable to DRPA as a Matter of Federal Interstate Compact Law. ... 2

C. Arguments About the Importance of Safeguarding the Public Fisc Do Not Override Federal Interstate Compact Law. ... 3

D. Acting Comptroller Walsh's "Threshold" Arguments for Dismissal Are Meritless. ... 5

STATEMENT OF FACTS ... 8

A. DRPA Creation and Functions ... 8

B. Founding States' Agreement in the DRPA Compact Relating to Transparency and Accountability ... 9

C. OSC's and Pennsylvania Auditor General's Respective Investigatory Authority ... 11

D. OSC's Past Efforts to Investigate and Audit DRPA Operations ... 14

E. OSC's Recent Issuance of Subpoena to DRPA to Compel Production of Documents ... 16

F. DRPA's Offer to Voluntarily Provide Documents and Cooperate with OSC ... 17

G. OSC Issuance of Subpoena Commanding DRPA to Provide Witness Testimony ... 17

H. OSC's Refusal to Withdraw the Subpoenas and Ensuing Litigation ... 18

ARGUMENT ... 19

THE MOTION TO DISMISS SHOULD BE DENIED, AND DRPA'S CROSS-MOTION FOR SUMMARY JUDGMENT ON ITS DECLARATORY JUDGMENT CLAIM SHOULD BE GRANTED. ... 19

I. LEGAL STANDARDS ... 19

A. Standard for Motion to Dismiss ....................19

B. Summary Judgment Standard ....................20

II. THE "THRESHOLD" ARGUMENTS PRESENTED IN THE MOTION TO DISMISS ARE MERITLESS. ....................22

A. This Action Presents a Ripe, Justiciable "Case or Controversy". ....................22

B. DRPA's Compact Did Not Require Notice or Resolution as a Precondition to Filing this Action. ....................34

C. As a Suit Against a State Official for Violation of Federal Law, DRPA's Action is Proper Under *Ex parte Young*. ....................38

III. SUBPOENA POWER CONFERRED ON THE OSC CANNOT BE APPLIED TO DRPA WITHOUT PENNSYLVANIA'S CONSENT. ....................40

A. Interstate Entities Are Created Through Congressionally-Approved Compacts Between States ....................41

B. Interstate Entities are Created Through the Founder States' Surrender of a Portion of their Sovereign Authority. ....................42

C. Bi-State Entities Are Not Subject to Unilateral Imposition of Duties by Either of the Founder States ....................43

D. The Founder States Have Not Consented to Application of New Jersey Law Governing OSC Investigations to DRPA. ....................45

E. Surrenders of Sovereignty Are Not Limited Only to Subjects Expressly Mentioned in the Compact. ....................45

F. Arguments About the Language and Purpose of the N.J. Statutes Granting OSC Subpoena Power are Misfocused. ....................52

CONCLUSION ....................55

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

Abbott Labs. v. Gardner,
387 U.S. 136 (1967)....................24

American Eagle Outfitters v. Lyle & Scott Ltd.,
584 F.3d 575 (3d Cir. 2009) ....................21

Anderson v. Liberty Lobby. Inc.,
477 U.S. 242 (1986)....................21

Ashcroft v. Iqbal,
556 U.S. 662 (2009)....................19

Babbitt v. United Farm Workers National Union,
442 U.S. 289 (1979)....................24

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007)....................19

Berckeley Inv. Grp. v. Colkitt,
455 F.3d 195 (3d Cir. 2006) ....................20

Brust v. ACF Industries, LLC,
Civil Action No. 11–4839, 2011 WL 6756921 (D.N.J. Dec. 21, 2011) ....................44

Circuit City Stores, Inc. v. Adams,
532 U.S. 105 (2001)....................36, 37

Cohen v. Kurtzman,
45 F. Supp.2d 423 (D.N.J. 1999)....................20

Constitution Party v. Aichele,
757 F.3d 347 (3d Cir. 2014) ....................32

Cuyler v. Adams,
449 U.S. 433 (1981)....................39

Delaware River Joint Toll Bridge Comm'n v. Colburn,
310 U.S. 419 (1940)....................39

Delaware River Joint Toll Bridge Comm'n v. Secretary Pa. Dep't of Labor & Indus., 985 F.3d 189 (3d Cir. 2021) .......... *passim*

Delaware River Port Auth. v. Fraternal Order of Police, 135 F. Supp.2d 596 (E.D. Pa. 2001), rev'd on other grounds, 290 F.3d 567 (3d Cir. 2002) .......... 44

First Choice Women's Resource Centers, Inc. v. Platkin, Civ. Act. No. 23-23076, 2024 WL 150096 (D.N.J. Jan. 12, 2024) .......... 22, 30, 31

Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009) .......... 19

Free Speech Coal., Inc. v. Att'y Gen. of United States, 825 F.3d 149 (3d Cir. 2016) .......... 31

Freehold Cogeneration Associates, L.P. v. Board of Regulatory Commissioners, 44 F.3d 1178 (3d Cir. 1995) .......... 26

Hedges v. United States, 404 F.3d 744 (3d Cir. 2005) .......... 19

Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30 (1994) .......... *passim*

HIP Heightened Indep. & Progress, Inc. v. Port Auth. of N.Y. & N.J., 693 F.3d 345 (3d Cir. 2012) .......... 48, 49, 52, 54

International Union of Operating Eng'rs, Local 542 v. Delaware River Joint Toll Bridge Comm'n, 311 F.3d 273 (3d Cir. 2002) .......... *passim*

Keystone Outdoor Advertising Co., Inc. v. Secretary of Pa. Dep't of Trans., Civ. A. No. 19-5951, 2022 WL 2805335 (E.D. Pa. July 18, 2022) .......... *passim*

Khodara Env't, Inc. v. Blakey, 376 F.3d 187 (3d Cir. 2004) .......... 32

Malleus v. George, 641 F.3d 560 (3d Cir. 2011) .......... 19

Maryland Casualty Co. v. Pacific Coal & Oil Co.,
312 U.S. 270 (1941)....................................................................................24

MedImmune, Inc. v. Genentech, Inc.,
549 U.S. 118 (2007)..............................................................................24, 31

Middle South Energy, Inc. v. Arkansas Public Service Commission,
772 F.2d 404 (8th Cir. 1985) ........................................................................27

Mortensen v. First Fed. Sav. & Loan Ass'n,
549 F.2d 884 (3d Cir. 1977) .........................................................................20

NE Hub Partners, L.P. v. CNG Transmission Corp.,
239 F.3d 333 (3d Cir. 2001) .....................................................................*passim*

Newman & Schwarz v. Asplundh Tree Expert Co., Inc.,
102 F.3d 660 (2d Cir. 1996) .........................................................................20

Pension Benefit Guar. Corp. v. White Consol. Indus.,
998 F.2d 1192 (3d Cir. 1993) .......................................................................20

Pic-A-State Pa., Inc. v. Reno,
76 F.3d 1294 (3d Cir. 1996) .........................................................................25

Pignataro v. Port Auth. of N.Y. & N.J.,
593 F.3d 265 (3d Cir. 2010) .........................................................................21

Plains All Am. Pipeline L.P. v. Cook,
866 F.3d 534 (3d Cir. 2017) .........................................................................31

Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio,
40 F.3d 1454 (3d Cir. 1994) .........................................................................23

Right Way Nutrition, LLC v. General Nutrition Corp.,
421 F. Supp.3d 78 (W.D. Pa. 2019)..............................................................21

Rockies Exp. Pipeline LLC v. Indiana State Nat. Resources Comm'n,
No. 1:08-cv-1651-RLY-JMS, 2009 WL 3060216 (S.D. Ind. Sept. 23, 2009) ...........................................................................................27

Sayles Hydro Associates v. Maughan,
985 F.2d 451 (9th Cir. 1993) ........................................................................27

Scheuer v. Rhodes,
416 U.S. 232 (1974), overruled on other grounds, Davis v. Scherer,
468 U.S. 183 (1984)....................................................................................20

Spence-Parker v. Delaware River & Bay Auth.,
616 F. Supp.2d 509 (D.N.J. 2009)..........................................................42, 43, 54

Step-Saver Data Sys., Inc. v. Wyse Tech.,
912 F.2d 643 (3d Cir. 1990) ..........................................................24, 25, 29, 30

Toll Bros., Inc. v. Twp. of Readington,
555 F.3d 131 (3d Cir. 2009) ..........................................................................23

United States v. Maurer,
639 F.3d 72 (3d Cir. 2011) ............................................................................37

Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,
535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) ....................................39

Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler,
537 U.S. 371 (2003)....................................................................................37

Ex parte Young,
209 U.S. 123 (1908)...................................................................7, 38, 39, 40

**State Cases**

Delaware River Joint Toll Bridge Comm'n v. George Harms Constr. Co., Inc.,
258 N.J. 286 (2024) ....................................................................................49

**State Statutes**

36 P.S. § 3503 ..........................................................................35, 36, 45, 51

36 P.S. § 3505.1 ...............................................................................................43

72 P.S. § 401, et seq. ..................................................................................13, 14

N.J.S.A. 32:3-1, et seq. .....................................................................................45

N.J.S.A. 32:3-5.........................................................................35, 36, 45, 51

N.J.S.A. 32:3-6..................................................................................................51

N.J.S.A. 52:15B-1, et seq. .......... 12, 17, 18

N.J.S.A. 52:15C-1, et seq. .......... 11, 17, 18

N.J.S.A. 52:15C-21(c) .......... 12

**Rules**

Federal Rule of Civil Procedure 12(b)(1) .......... 20

Federal Rule of Civil Procedure 12(b)(6) .......... 19, 20, 33

Federal Rule of Civil Procedure 56(a) .......... 20

**Constitutional Provisions**

Eleventh Amendment .......... 7, 38, 39

Fourteenth Amendment .......... 40

U.S. Const. Article I, § 10, cl. 3 .......... 41

U.S. Const. Article III, § 2 .......... 23

**Other Authorities**

2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991) .......... 36

History of DRPA, available at https://www.drpa.org/about/history.html .......... 42

https://www.merriam-webster.com/dictionary/preference .......... 36

M. Ridgeway, Interstate Compacts: A Question of Federalism 300 (1971) .......... 42

Matthew S. Tripolitsiotis, Bridge Over Troubled Waters: The Application of State Law to Compact Clause Entities, 23 Yale L. & Pol'y Rev. 163, 167 (2005) .......... 43, 44

# INTRODUCTION

Plaintiff, the Delaware River Port Authority ("DRPA") submits this memorandum of law (1) in opposition to the motion to dismiss filed by Defendant, Acting New Jersey State Comptroller Kevin D. Walsh ("Acting Comptroller Walsh"), and (2) in support of DRPA's cross-motion for summary judgment on its declaratory judgment claim.

This action involves a straightforward application of federal interstate compact law, similar to numerous other cases previously decided by this and other courts within the Third Circuit. Although the dispute originated from issuance of subpoenas, this action does ***not*** involve the substance of those subpoenas. Indeed, DRPA offered to voluntarily provide the information sought. Rather, this action involves the broader issue of whether New Jersey's Office of the State Comptroller ("OSC") has jurisdiction and authority to audit and investigate DRPA, and to compel DRPA's compliance with such audit/investigation.

## A. As a Bi-State Entity, DRPA is Not Subject to Application of One Founder State's Law Without Legislative Consent from the Other Founder State.

DRPA is a bi-state entity, created pursuant to the Compact Clause of the U.S. Constitution through an interstate compact between New Jersey and Pennsylvania ratified by the U.S. Congress. When two or more states enter into such a compact, they surrender a portion of their sovereignty to the newly-created entity. As a result, bi-state entities like DRPA are distinct entities that cannot be

regulated or controlled as if they were a branch of state government. And, neither founder state can unilaterally apply its laws to a bi-state entity without legislative consent from the other founder state. These fundamental, bedrock principles – articulated by the U.S. Supreme Court and the Third Circuit Court of Appeals – dictate the resolution of this action.

### B. **<u>The N.J. Statutory Subpoena Power Upon Which Defendant Relies is Inapplicable to DRPA as a Matter of Federal Interstate Compact Law.</u>**

Acting Comptroller Walsh derives his investigatory and subpoena power from two New Jersey state statutes. Relying on those statutes, Acting Comptroller Walsh issued two subpoenas to DRPA to gather information for an audit and investigation of DRPA operations and management. By doing so, Acting Comptroller Walsh did exactly what federal interstate compact law prohibits – he attempted to unilaterally apply one founder state's law to impose an obligation on a bi-state entity beyond what was expressly agreed to in the founding states' compact. Because of the surrender of sovereignty through which DRPA was created, that New Jersey statutory subpoena power is – as a matter of law – inapplicable to DRPA. Pennsylvania, the other founder state, has not enacted legislation consenting to application of that New Jersey law to DRPA.

Numerous other state statutes have been declared inapplicable to DRPA, or to other bi-state entities, based upon the same fundamental principle prohibiting application of one founder state's law without legislative consent of the other

founder state – including, for example, the N.J. Law Against Discrimination, the N.J. Conscientious Employee Protection Act, and state laws governing construction codes, collective bargaining, and competitive bidding.

### C. Arguments About the Importance of Safeguarding the Public Fisc Do Not Override Federal Interstate Compact Law.

Despite inaccurately characterizing DRPA as attempting to "avoid" the subpoenas, Acting Comptroller Walsh admits – as he must – that (1) DRPA offered to voluntarily provide him with the documents requested through the subpoenas; and (2) DRPA has voluntarily cooperated with all of the OSC's prior requests for documents. DRPA's history of voluntary cooperation reflects DRPA's commitment to transparency and accountability.

Moreover, Acting Comptroller Walsh's repeated insinuations of supposed past "fiscal impropriety" are inappropriate in the context of a motion to dismiss, and irrelevant to the discrete, purely legal issue before the Court. Thus, DRPA will not "take the bait" and respond, other than to say that DRPA's many significant policy and procedure reforms since 2012, in furtherance of its continual efforts to promote transparency and accountability, are a matter of public record. Neither Acting Comptroller Walsh's aspersions against DRPA, nor his soliloquies about the "importance" of safeguarding New Jersey's public fisc, provide any basis for the Court to ignore clear, binding U.S. Supreme Court and Third Circuit law.

New Jersey, operating through Acting Comptroller Walsh, cannot apply its laws to regulate or impose obligations on a bi-state entity like DRPA without express legislative consent from Pennsylvania. It is undisputed that Pennsylvania has not given such consent. Had New Jersey wanted to retain a unilateral right to subject DRPA to OSC investigations, it needed to bargain for such right and ***expressly reserve*** it in the interstate compact negotiated by the founder states and approved by the U.S. Congress. Third Circuit precedent recognizes that the founder states' surrender of sovereignty to an interstate entity is ***complete and unambiguous***, except as to authority ***specifically and expressly reserved*** in the compact language. ***No express reservation of a right for New Jersey to unilaterally subject DRPA to OSC audit investigations appears in the DRPA's interstate compact.*** Instead, the founder states agreed that DRPA would conduct periodic self-audits and self-reporting to the Governors of the founder states.

Simply put, the principle that one founder state cannot apply its law to impose obligations on a bi-state entity without express legislative consent from the other founder state, absent an express reservation of such authority in the compact, precludes Acting Comptroller Walsh from issuing subpoenas to DRPA. Therefore, DRPA is entitled to summary judgment on its declaratory judgment claim as a matter of law.

### D. Acting Comptroller Walsh's "Threshold" Arguments for Dismissal Are Meritless.

Acting Comptroller Walsh seeks dismissal of DRPA's action based upon several "threshold" arguments, but each of those arguments is meritless.

#### 1. The Parties' Dispute is a "Case or Controversy" Ripe for Adjudication Through a Declaratory Judgment Action.

Acting Comptroller Walsh argues that the Court lacks subject matter jurisdiction, asserting that the parties' dispute is not sufficiently "ripe" to constitute an actual "case or controversy". Defendant relies upon a prior decision of this Court that issuance of a "non-self-executing state administrative" subpoena creates no adversity or harm until the subpoena has been enforced in state court. However, that prior case involved different circumstances and a different issue. There, the plaintiff did not contest that the state agency possessed subpoena ***authority*** applicable to the plaintiff, but instead challenged only whether plaintiff could be compelled to produce the ***particular information*** sought through the subpoena. Here, the circumstances are opposite. DRPA's action does not relate to the substance of the subpoena, but instead to authority – whether federal interstate compact law precludes Acting Comptroller Walsh from issuing any subpoena against DRPA.

Precedent from the Third Circuit and other circuit courts of appeal dictates the appropriate ripeness analysis. In analogous situations where a plaintiff sought declaratory judgment that federal law preempted and precluded state administrative

action against it, these courts have held that that the declaratory judgment action was ripe even though the state administrative action was ongoing and the ultimate result therefore was contingent and unknown. The circuit courts recognized that, in such circumstances, ***merely being subjected to a state administrative process precluded by federal law creates sufficient adversity and harm to create a justiciable "case or controversy"***. That same ripeness analysis applies here, where DRPA seeks declaratory judgment that federal interstate compact law precludes OSC's administrative investigatory/subpoena process against DRPA. Indeed, Acting Comptroller Walsh's brief acknowledges that this matter presents the issue of "whether OSC's subpoenas are ***preempted*** by the [DRPA] Compact (a question of federal law)". (Def. Mov. Br. at 2) (emphasis added.)

**2. <u>DRPA's Ability to Commence this Action Was Not Constrained by Any Notice or Resolution Prerequisites.</u>**

Acting Comptroller Walsh argues that DRPA was required to pass a resolution and provide advance notice to the New Jersey and Pennsylvania attorneys general before filing this action. However, that argument is based upon an inaccurate and incomplete reading of the DRPA's interstate compact. The provision upon which Acting Comptroller Walsh bases that argument applies only to a certain, specific subset of actions involving financial matters. Other provisions of the compact broadly authorize DRPA to file lawsuits without precondition.

### 3. Eleventh Amendment Immunity Does Not Apply to this Action Against a State Official.

Finally, there is no merit to Acting Comptroller Walsh's argument that Eleventh Amendment sovereign immunity bars this action. The U.S. Supreme Court's decision in Ex parte Young definitively established that a litigant may sue a ***state official*** to prevent an ongoing violation of federal law. That is exactly what DRPA has done here. The Third Circuit, relying on Ex parte Young, rejected an Eleventh Amendment argument in a similar action by another bi-state entity seeking declaratory judgment against the head of a Pennsylvania state agency to preclude that agency from imposing state law requirements against the bi-state entity in violation of federal interstate compact law. In short, U.S. Supreme Court and Third Circuit precedent conclusively refutes Acting Comptroller Walsh's Eleventh Amendment immunity argument.

In sum, all of Acting Comptroller Walsh's arguments for dismissal of DRPA's action are meritless. Furthermore, New Jersey statutory law authorizing and empowering the OSC to exercise subpoena power cannot be applied against DRPA without express legislative consent from Pennsylvania. It is undisputed that Pennsylvania has not enacted legislation consenting to investigation of DRPA by New Jersey's OSC. Therefore, summary judgment should be entered granting DRPA's declaratory judgment claim.

# STATEMENT OF FACTS

## A. DRPA Creation and Functions

In 1931, the State of New Jersey and the Commonwealth of Pennsylvania jointly created the direct predecessor to the DRPA, the Delaware River Joint Commission. (See Statement of Undisputed Material Facts ("SUMF") at ¶ 1.) The interstate compact between New Jersey and Pennsylvania forming that entity (the "DRPA Compact") was codified in legislation enacted by each founder state's legislature, and then ratified by the U.S. Congress in 1932. (See SUMF at ¶ 2.) The Delaware River Joint Commission, which later changed its name to the DRPA, was created for the purpose of developing and maintaining certain interstate transportation routes over the Delaware River, namely bridges and port facilities, between the two founder states. (See SUMF at ¶ 3.)

The DRPA Compact provides the DRPA with independent authority to perform a vast number of essential government functions including, but not limited to, the operation and maintenance of certain bridges across the Delaware River, development of the Port District, studying and making recommendations for the improvement of terminal, wharfage, warehouse, lighterage and other facilities necessary for the promotion of commerce on the Delaware River, and the establishment and operation of a rapid transit system. (See SUMF at ¶ 4.)

The DRPA Board of Commissioners consists of 16 Commissioners – 8 Commissioners from New Jersey and 8 Commissioners from Pennsylvania. (See

SUMF at ¶ 5.) All of the New Jersey Commissioners are appointed by New Jersey's Governor, with the advice and consent of the New Jersey Senate. (Ibid.) Six of the eight Pennsylvania Commissioners are appointed by Pennsylvania's Governor, with Pennsylvania's Auditor General and State Treasurer being ex officio Commissioners. (Ibid.) A majority of Commissioners for each founder state must vote in favor of any Board action for that action to be approved. (See SUMF at ¶ 6.) And, the DRPA Compact reserves the authority for New Jersey's and Pennsylvania's Governors, respectively, to veto actions of the DRPA Board of Commissioners. (Ibid.)

### B. Founding States' Agreement in the DRPA Compact Relating to Transparency and Accountability

The DRPA Compact places external reporting requirements on the DRPA, including that the DRPA will, within 90 days after the end of each fiscal year, submit to the Governors and legislatures of New Jersey and Pennsylvania a complete and detailed report of the following:

> (1) its operations and accomplishments during the completed fiscal year; (2) its receipts and disbursements or revenues and expenses during that year in accordance with the categories and classifications established by the [DRPA] for its own operating and capital outlay purposes; (3) its assets and liabilities at the end of the fiscal year, including the status of reserve, depreciation, special or other funds including debits and credits of these funds; (4) a schedule of bonds and notes outstanding at the end of the fiscal year; (5) a list of all contracts exceeding $100,000 entered into during the fiscal year; (6) a business or strategic plan for the [DRPA] and for each of its operating divisions; and (7) a five year capital plan.

(See SUMF at ¶ 7.)

The DRPA Compact envisions that the DRPA – not either Pennsylvania or New Jersey – shall investigate or otherwise audit the DRPA's operations. The founding states agreed in the DRPA Compact:

> Not less than once every five years, the [DRPA] shall cause a management audit of its operational effectiveness and efficiency to be conducted by an independent consulting firm selected by the [DRPA]. The first management audit to be conducted shall commence within 3 years of the date of coming into force of the supplemental compact or agreement authorized by this 1991 Amendatory Act. This audit is in addition to any other audit which the [DRPA] determines to conduct from time to time.

(See SUMF at ¶ 8.)

In 2012, the DRPA's Board of Commissioners created a new Inspector General position for DRPA. (See SUMF at ¶ 11.) The Inspector General reports to both the DRPA's Chief Executive Officer and the DRPA's Audit Committee. (See SUMF at ¶ 12.) The Inspector General is intended "to be an independent watchdog within the DRPA." (Ibid.) The Inspector General is responsible for detecting and deterring waste, fraud, abuse, corruption, mismanagement and any alleged illegal activity that might involve the DRPA or PATCO. (Ibid.) The DRPA Inspector General oversees and manages the internal and external audits required by the DRPA Compact, as well as the DRPA's whistleblower hotline. (Ibid.)

The DRPA Compact contains no language subjecting the DRPA to the jurisdiction of the OSC. (See SUMF at ¶ 9.) Likewise, the DRPA Compact

contains no language expressly reserving to New Jersey the authority to separately and independently investigate or audit DRPA's operations under the provisions of any New Jersey law relating to investigation of New Jersey state agencies or their operations. (Ibid.)

### C. OSC's and Pennsylvania Auditor General's Respective Investigatory Authority

#### 1. OSC's Investigative Authority

New Jersey's Legislature created the OSC and the position of N.J. Comptroller in 2007. (See SUMF at ¶ 13.) The OSC's Investigations Division was formed in 2010 after the New Jersey legislature consolidated the powers of New Jersey's Office of the Inspector General into the OSC. (See SUMF at ¶ 14.) The powers and duties of the OSC are described in N.J.S.A. 52:15C-1, et seq. (the "Comptroller Statute"), Section 5 of which provides, in relevant part:

> The Office of the State Comptroller shall be responsible for conducting, in accordance with section 8 of this act, routine, periodic and random audits ***of the Executive branch of State government, including all entities exercising executive branch authority, public institutions of higher education, independent State authorities, units of local government and boards of education*** and for conducting assessments of the performance and management of programs ***of the Executive branch of State government, including all entities exercising executive branch authority, public institutions of higher education, independent State authorities, units of local government and boards of education*** and the extent to which they are achieving their goals and objectives. The Office of the State Comptroller shall also serve as the office in which the Office of the State Inspector General, which shall be responsible for all the duties assigned pursuant to P.L.2005, c. 119 (C.52:15B-1 et seq.), is allocated within the Department of the Treasury.

(See SUMF at ¶ 15.)

Section 14 of the Comptroller Statute describes OSC's authority to obtain records, and the duty of entities within the Executive Branch of the New Jersey State government to comply with OSC's records requests:

> a. All units in the Executive branch of State government, including entities exercising Executive branch authority, independent State authorities, public institutions of higher education, units of local government and boards of education and their employees shall provide full assistance and cooperation with any audit, performance review or contract review by the State Comptroller.
>
> b. The State Comptroller shall have complete access to all "government records" of "public agencies," as those terms are defined pursuant to section 1 of P.L.1995,c.23 (C.47:1A-1.1), including all information listed as confidential and specifically excluded as a "government record," in section 1 of P.L.1995,c.23 (C.47:1A-1.1). Provided however, that any information listed as confidential and specifically excluded as a "government record," in that section, to which the State Comptroller shall have access, shall directly relate to a program or expenditure that is the subject of an audit, performance review or contract review by the State Comptroller, and provided further that if a public agency provides the State Comptroller with access to information that is subject to a confidentiality agreement, the public agency shall promptly notify the parties to the agreement that the information is being provided to the State Comptroller.

(See SUMF at ¶ 16.)

Since consolidation with the Office of Inspector General, the OSC has also had the powers and responsibilities delegated in N.J.S.A. 52:15B-1, et seq. (the "Inspector General Statute"). See N.J.S.A. 52:15C-21(c). The Inspector General Statute empowers the OSC to investigate:

> the awarding and the execution of ***contracts awarded by the State***, or any of its independent authorities, commissions, boards, agencies, or

> instrumentalities, which contracts involve a significant expenditure of public funds or are comprised of complex or unique components, or both, as determined by the Inspector General; and [to investigate] the performance of governmental officers, employees, appointees, functions, and programs in order to promote efficiency, to identify cost savings, and to detect and prevent misconduct within the programs and operations of any governmental agency funded by, or disbursing, ***State funds***.

(See SUMF at ¶ 17) (emphasis added.)

The provision of the Inspector General Statute authorizing issuance of subpoenas states:

> In furtherance of an investigation, the Inspector General may compel at a specific time and place, by subpoena, the appearance and sworn testimony of any person whom the Inspector General reasonably believes may be able to give information relating to a matter under investigation. For this purpose, the Inspector General is empowered to administer oaths and examine witnesses under oath, and compel any person to produce at a specific time and place, by subpoena, any documents, books, records, papers, objects, or other evidence that the Inspector General reasonably believes may relate to a matter under investigation.

(See SUMF at ¶ 18.)

### 2. Pennsylvania's Auditor General's Investigative Authority

According to the Pennsylvania Auditor General's website, the "Pennsylvania Department of the Auditor General is the chief fiscal watchdog of the commonwealth. It is responsible for using audits to ensure that all state money is spent legally and properly." (See SUMF at ¶ 19.) The powers and duties of the Auditor General are set forth in 72 P.S. § 401, et seq. (the "Auditor General Statute"). (See SUMF at ¶ 20.) The Auditor General Statute does ***not*** contain any

language purporting to concur in application of either the Comptroller Statute or the Inspector General Statute to the DRPA. See 72 P.S. § 401, et seq.

### D. OSC's Past Efforts to Investigate and Audit DRPA Operations

#### 1. 2010 OSC Investigation

In 2010, concerns regarding certain operations and practices at DRPA led the Governors of Pennsylvania and New Jersey to request that DRPA allow a full internal audit of the DRPA's budget and performance by the Pennsylvania Auditor General and the N.J. Comptroller. (See SUMF at ¶ 21; see also Def. Mov. Br. at 6.)

On August 18, 2010, DRPA's Board of Commissioners adopted Resolution DRPA 10-040, which was subsequently amended on August 25, 2010. (See SUMF at ¶ 22; see also Def. Mov. Br. at 6.) Through that resolution, the DRPA Board of Commissioners – acknowledging the joint and express desires of the Pennsylvania and New Jersey Governors – ***voluntarily invited*** the OSC to conduct an internal audit of the DRPA. (Ibid.) As part of the DRPA-invited audit, the DRPA voluntarily cooperated, providing a large quantity of documents to the OSC. (See SUMF at ¶ 23.) However, as to a limited set of documents that contained sensitive personal information from personnel records, DRPA ***invited*** OSC to issue a "friendly subpoena" with the belief that this would provide extra protection for such personal information. (Ibid.) OSC ultimately issued an Investigative Report in March 2012 detailing the results of OSC's investigation. (See SUMF at ¶ 24.)

To address issues identified in that investigation, the DRPA subsequently passed a series of Reform Resolutions, making significant changes to internal procedures to enhance transparency and accountability. (Ibid.)

### 2. 2020 OSC Investigation

In April 2020, the OSC sent DRPA a ***letter*** (not a subpoena) containing a new request for information and documents to support another investigation. (See SUMF at ¶ 25; see also Def. Mov. Br. at 7.) DRPA's outside counsel responded to the OSC letter. (Ibid.) As the DRPA has consistently done, DRPA again agreed to voluntarily cooperate, and to provide the requested documents and information on a voluntary basis. (Ibid.) DRPA's outside counsel advised that despite the OSC's attempt to characterize its request as part of the prior 2010-2012 investigation, the DRPA considered this a new investigation given the passage of time and the fact that OSC had already issued its final Investigative Report in 2012. (See SUMF at ¶ 26.) DRPA's counsel further noted that "[u]nlike the situation in 2010, the DRPA Board of Commissioners has not voluntarily invited or authorized OSC to undertake another investigation." (Ibid.) And, DRPA's counsel explained that OSC lacked authority to compel DRPA's compliance with its document requests. (Ibid.) Thus, DRPA's counsel advised: "[w]e want to make expressly clear . . . that DRPA's decision to voluntarily provide this information should not be viewed as an acknowledgement of OSC's authority to investigate or audit the DRPA, a waiver of DRPA's immunity from unilateral regulation, or a commitment of

DRPA to provide any additional information in response to any future request by OSC." (Ibid.)

OSC subsequently contacted DRPA's outside counsel in June 2020 requesting certain additional information as a follow-up. (See SUMF at ¶ 27.) DRPA voluntarily agreed to provide the additional information. (Ibid.) Once again, the DRPA's outside counsel advised the OSC that DRPA's cooperation was strictly voluntary, as OSC lacked authority to compel DRPA to provide documents or information for OSC's investigation: "[a]s DRPA previously did in response to OSC's April 8, 2020 'follow-up' request, DRPA has decided voluntarily to provide the information requested by OSC. In doing so, we again note that the OSC lacks authority to require the DRPA to provide additional or 'updated' information." (Ibid.)

### E. OSC's Recent Issuance of Subpoena to DRPA to Compel Production of Documents

Four years later, OSC has determined to undertake another investigation. However, for the first time, OSC has attempted to do so by ***compelling*** compliance via an adversarial subpoena. On July 2, 2024, OSC's Investigations Division served DRPA with a subpoena duces tecum (the "Documents Subpoena"), stating that DRPA was "commanded" to search for, gather, and provide seven categories of documents. (See SUMF at ¶ 28.) The Documents Subpoena demanded that DRPA provide the requested documents to OSC by July 16, 2024, and include a

signed certification provided under penalty of "punishment". (See SUMF at ¶ 29.) The Documents Subpoena stated that "[t]his Subpoena is issued pursuant to the authority granted to the Office of the State Comptroller as set forth in N.J.S.A. § 52:15B-1 et seq. and N.J.S.A. § 52:15C-1 et seq. [the Comptroller and Inspector General Statutes]. Failure to comply with this Subpoena may render you liable for contempt of court and such other penalties as are provided by law." (Ibid.)

### F. DRPA's Offer to Voluntarily Provide Documents and Cooperate with OSC

DRPA determined to again ***voluntarily*** cooperate with OSC's investigation, but determined that it would need substantially more time to complete that process than the 14 days specified in the Documents Subpoena. (See SUMF at ¶ 30.) On July 17, 2024, DRPA's outside counsel emailed counsel for OSC, Suzanne Davies, Esq. explaining the need for more time to provide the requested documents. (See SUMF at ¶ 31.) Ms. Davies responded by email later that day indicating that DRPA's proposal to provide the requested documents in 45 days was unacceptable to OSC. (See SUMF at ¶ 32.)

### G. OSC Issuance of Subpoena Commanding DRPA to Provide Witness Testimony

In that same July 17, 2024 communication to DRPA's counsel, Ms. Davies attached a second subpoena to DRPA, this one demanding witness testimony (the "Testimony Subpoena"). (See SUMF at ¶ 33.) The Testimony Subpoena "commanded" DRPA to produce a Custodian of Records at OSC's Office in

Trenton, New Jersey to provide sworn testimony on August 8, 2024 concerning DRPA's collection and maintenance of records, and DRPA's practices and procedures for responding to requests for information from government entities. (Ibid.) The Testimony Subpoena stated that "[t]his Subpoena is issued pursuant to the authority granted to the Office of the State Comptroller as set forth in N.J.S.A. § 52:15B-1 et seq. and N.J.S.A. § 52:15C-1 et seq." (Ibid.) The Testimony Subpoena also stated that "[f]ailure to comply with this Subpoena may render you liable for contempt of court and such other penalties as provided by law." (Ibid.)

### H. OSC's Refusal to Withdraw the Subpoenas and Ensuing Litigation

DRPA's outside counsel conferred with OSC's counsel, Ms. Davies and Bryan Lucas, Esq., regarding the Document Subpoena and the Testimony Subpoena (collectively, the "Subpoenas"). (See SUMF at ¶ 34.) DRPA's outside counsel requested that OSC withdraw the Subpoenas so that DRPA could voluntarily provide the requested documents without risk or concern that DRPA would be viewed as somehow acknowledging or acceding to OSC's subpoena power. (See SUMF at ¶ 35.) OSC did not agree to withdraw either of the Subpoenas and, therefore, DRPA filed the instant federal action with DRPA's leadership's subsequent approval. (See SUMF at ¶ 36.) OSC subsequently filed an action against DRPA in New Jersey state court seeking to enforce the Subpoenas. (See SUMF at ¶ 37.) DRPA has moved to have the state court action

dismissed or stayed on comity grounds, in deference to this first-filed action. (See SUMF at ¶ 38.) That motion currently remains pending. (Ibid.)

## ARGUMENT

**THE MOTION TO DISMISS SHOULD BE DENIED, AND DRPA'S CROSS-MOTION FOR SUMMARY JUDGMENT ON ITS DECLARATORY JUDGMENT CLAIM SHOULD BE GRANTED.**

## I. LEGAL STANDARDS

### A. Standard for Motion to Dismiss

When a defendant moves to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, that "defendant bears the burden of showing that no claim has been presented." Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). Courts conduct a three-prong analysis when deciding a motion to dismiss under Rule 12(b)(6). Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'take note of the elements a plaintiff must plead to state a claim.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Second, the court must accept all of the plaintiff's well-pleaded factual allegations as true and must interpret the complaint in the light most favorable to the plaintiff. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Only legal conclusions, or unsupported conclusory factual allegations (of the kind that merely state "the-defendant-unlawfully-harmed-me") need not be accepted as true. Id.; Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Third, the court must determine whether the "facts alleged in the complaint are sufficient

to show that plaintiff has a 'plausible claim for relief.'" Fowler, 578 F.3d at 211 (quoting Iqbal, 556 U.S. at 679). The Court should not consider whether it believes the plaintiff ultimately will prevail, but only whether the plaintiff is entitled to offer evidence to support the claims in the complaint. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds, Davis v. Scherer, 468 U.S. 183 (1984).

A "facial" challenge under Rule 12(b)(1), asserting that a complaint fails on its face to establish subject matter jurisdiction, "offers a safeguard to the plaintiff similar to that of a Rule 12(b)(6) motion; the allegations of the complaint are taken as true." Cohen v. Kurtzman, 45 F. Supp.2d 423, 428 (D.N.J. 1999) (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

In conducting its analysis on a motion to dismiss, a court may rely on facts asserted within the four corners of the complaint, as well as documents attached to the complaint or documents incorporated into the complaint by reference. See Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 96 (3d Cir. 1993); Newman & Schwarz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 662 (2d Cir. 1996); (see also Def. Mov. Br. at 5 n.4.)

**B. Summary Judgment Standard**

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Berckeley Inv. Grp. v. Colkitt, 455 F.3d 195, 201 (3d Cir.

2006). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied [only] when there is a genuine issue of material fact." American Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir.2009) (quoting Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 247–248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. See Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.[1]

Here, the facts material to DRPA's declaratory judgment claim are not in dispute, and the governing law is well-established. Thus, the declaratory judgment claim can and should be resolved through entry of summary judgment.

---

[1] "A motion for partial summary judgment involves the same standards as a motion for full summary judgment." Right Way Nutrition, LLC v. General Nutrition Corp., 421 F. Supp.3d 78, 87 (W.D. Pa. 2019).

## II. THE "THRESHOLD" ARGUMENTS PRESENTED IN THE MOTION TO DISMISS ARE MERITLESS.

### A. This Action Presents a Ripe, Justiciable "Case or Controversy".

Acting Comptroller Walsh's ripeness argument myopically focuses on a recent ruling of this Court in another case involving a subpoena – a case that involved a very different and more limited issue. In so doing, Acting Comptroller Walsh fundamentally misunderstands the nature of this case and ignores controlling U.S. Supreme Court and Third Circuit law.

Unlike in First Choice, DRPA has ***not*** sued to preclude the subpoenaing state agency from obtaining the requested information. Indeed, DRPA offered to voluntarily provide the OSC with the requested documents. (See Def. Mov. Br. at 9; DRPA Complaint, ECF No. 1 ("Compl.") at ¶ 42.) ***DRPA sued to obtain resolution of a broader, more fundamental dispute that reaches beyond the particular subpoenas that OSC served on DRPA.*** This case seeks resolution of the parties' dispute over whether DRPA – a bi-state entity jointly created by Pennsylvania and New Jersey via interstate compact – is subject to OSC jurisdiction and subpoena authority. In other words, the issue here is whether OSC can ***ever*** exert ***any*** subpoena power against DRPA.

DRPA's suit is based upon the fundamental principle that under federal interstate compact law one founder state ***cannot*** unilaterally apply its state law to an interstate entity in order to impose an obligation beyond those expressly imposed in the entity's compact. Under that federal law, for OSC to even serve a

subpoena on DRPA is a violation of the DRPA Compact and federal interstate compact law. For ripeness purposes, this case is analogous to federal court actions for declaratory judgment that a state administrative process is inapplicable because it is preempted by federal law. Numerous courts – including the Third Circuit Court of Appeals – have rejected arguments (like Acting Comptroller Walsh's argument here) that such declaratory judgment actions are not ripe because the result of the state administrative process is "contingent". ***The Third Circuit has made clear that the attempt to apply a state law process – where that process is preempted and thus precluded by federal law – is alone sufficient harm to give rise to a ripe, justiciable "case or controversy"***.

### 1. A Dispute is Ripe for Determination by a Federal District Court When a Definite and Concrete Dispute Exists Between the Parties.

Article III of the Constitution limits the federal judiciary's authority to exercise its judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2. "The existence of a case and controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief." Presbytery of N.J. of Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1462 (3d Cir.1994). Courts enforce the "case or controversy" prerequisite "through the several justiciability doctrines that cluster about Article III," including "standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions." Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 137 (3d Cir. 2009) (internal

quotation marks omitted). Notably, the "case or controversy" requirement does ***not*** mandate that a party must wait until the threatened harm occurs before filing suit. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 129-30 (2007) ("where threatened action by ***government*** is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat") (emphasis in original).

The ripeness doctrine requires that a legal challenge grow out of a "real, substantial controversy between parties" involving a "dispute definite and concrete." Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298 (1979) (citation omitted). The question in each case is whether the facts alleged show that there is a substantial controversy "of sufficient immediacy and reality" to justify judicial resolution. Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941). The Supreme Court has articulated a two factor test for determining ripeness: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967).

In the context of declaratory judgment actions, Third Circuit courts analyze those two issues under the following three factors: (1) the adversity of the parties' interests; (2) the probable conclusiveness of a judgment; and (3) the practical utility to the parties of rendering a judgment. Step-Saver Data Sys., Inc. v. Wyse

Tech., 912 F.2d 643, 647 (3d Cir. 1990); see also Pic-A-State Pa., Inc. v. Reno, 76 F.3d 1294, 1298 (3d Cir. 1996).

### 2. There is Sufficient Adversity of Party Interests to Create a Ripe "Case or Controversy".

Acting Comptroller Walsh argues that this matter is not ripe, contending that whether DRPA will suffer any injury is "contingent" upon a future event – enforcement of the Subpoenas by a state court. (Def. Mov. Br. at 11-12.) Acting Comptroller Walsh argues that "unless and until the subpoena is enforced by the state court", thereby rendering DRPA subject to penalties for noncompliance, "DRPA has not suffered an actual or imminent injury". (Id. at 12.) That argument focuses on the "adversity" factor of the Step-Saver test.

Litigants have made that same argument to contest the ripeness of federal actions seeking declaratory judgment that state administrative action is preempted, and thus precluded, by federal law. That situation is analogous to the present case. Indeed, Acting Comptroller Walsh's brief acknowledges that this matter presents the issue of "whether OSC's subpoenas are ***preempted*** by the [DRPA] Compact (a question of federal law)". (Def. Mov. Br. at 2) (emphasis added.)

As explained by the Third Circuit Court of Appeals, that argument, "which focuses on the possible ultimate result of the state regulatory process, does not take into account … that preemption ***may operate to spare a party from that very process. In fact, the process itself may give rise to adversity so that an action***

***challenging the process is ripe even before the process concludes***." NE Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 342 (3d Cir. 2001) (emphasis added).

The Third Circuit referred in NE Hub to its prior decision in Freehold Cogeneration Associates, L.P. v. Board of Regulatory Commissioners, 44 F.3d 1178 (3d Cir. 1995), where "we held that a preemption challenge to ongoing proceedings before the New Jersey Board of Regulatory Commissioners invading FERC's domain was ripe even though 'the plaintiff did not challenge the ultimate substantive decision, ***but rather its authority to conduct proceedings***'". NE Hub, 239 F.3d at 342 (quoting Freehold, 44 F.3d at 1189) (emphasis added). The Third Circuit summarized: "When such a claim [of preemption] has been advanced, the need to participate in a state regulatory process in conflict with federal policy has been recognized as a hardship. … ***[W]e reiterate that we are quite unable to understand why … a claim that a state administrative process is preempted necessarily cannot be ripe when the alleged preemption is of the process itself rather than the possible outcome of the process***." Id. at 346, 348 (emphasis added). The circuit court further observed that if the state process "might well reach a result that would be preempted" by federal law, "***it would defy logic to hold that the process itself cannot be preempted and that a complaint seeking that result would not raise a ripe issue***." Id. at 348 (emphasis added).

Courts of Appeal in other Circuits have reached the same result through the same reasoning. In Sayles Hydro Associates v. Maughan, 985 F.2d 451, 453-54, 456 (9th Cir. 1993), a California state water board had held back on issuing a hydroelectric plant permit on grounds that the applicant had not supplied certain studies and reports. The Ninth Circuit found the applicant's federal court claim that the Federal Power Act preempted the still-ongoing state permitting process was ripe, concluding that "***[t]he hardship is the process itself***". Id. at 454 (emphasis added).

Likewise, in Middle South Energy, Inc. v. Arkansas Public Service Commission, 772 F.2d 404 (8th Cir. 1985), the Court of Appeals for the Eighth Circuit found ripe a federal court action claiming that ongoing Arkansas state agency proceedings were preempted by federal law. The circuit court observed that the plaintiff "***challenge[d] not the state's ultimate substantive decision but its authority even to conduct the contemplated proceeding***. ***It can hardly be doubted that a controversy sufficiently concrete for judicial review exists when the proceeding sought to be enjoined is already in progress***. Id. at 410-11. See also Rockies Exp. Pipeline LLC v. Indiana State Nat. Resources Comm'n, No. 1:08-cv-1651-RLY-JMS, 2009 WL 3060216, *2 (S.D. Ind. Sept. 23, 2009) (pipeline company REX's declaratory judgment action on preemption grounds presented an actual controversy, and was ripe, despite ongoing state NRC administrative proceeding because "***REX is not challenging the NRC's anticipated substantive***

***decision, but rather the NRC's authority to conduct the administrative review***") (emphasis added).

In short, the Third Circuit and all of these other courts found that although the ultimate result of an ongoing state administrative process was contingent, ***being subject to a process that the agency lacked authority to conduct*** provided sufficient adversity to create a real controversy that was ripe for federal review. See, e.g., NE Hub, 239 F.3d at 342-44. The exact same reasoning applies here. Indeed, Acting Comptroller Walsh's brief recognizes that DRPA's action essentially presents an issue of "preemption". (See Def. Mov. Br. at 2.) There is a body of federal law that precludes application of a state law process (here, the administrative subpoena process) to DRPA. As recognized in the above-cited cases, it does not matter that the state administrative process is ongoing and the results not yet known. Simply being subject to a process that the OSC has no jurisdiction and authority to conduct creates sufficient harm and adversity.

**3. A Judgment in This Matter Will Conclusively Resolve the Issue in Dispute.**

"Conclusiveness is a short-hand term for whether a declaratory judgment definitively would decide the parties' rights. It also addresses the extent to which further factual development of the case would facilitate decision, so as to avoid issuing advisory opinions, or whether the question presented is predominantly legal." NE Hub, 239 F.3d at 344 (citation omitted). The Third Circuit found that

the NE Hub declaratory judgment action would be "conclusive" because it would definitively establish whether or not the state agency could continue to pursue the administrative process against the plaintiff – "a conclusive result". Ibid. The court also observed that "a determination of whether there is preemption ***primarily raises a legal issue***," which favors that a declaratory judgment action would provide conclusive relief. Ibid. (emphasis added).

Here, the issue raised by DRPA's Action, being akin to preemption, is primarily legal – whether federal interstate compact law barring a founder state from unilaterally applying its laws to impose an obligation on a bi-state entity precludes New Jersey (through Acting Comptroller Walsh) from issuing subpoenas to DRPA. And, the Court's decision on that issue would be "conclusive" because it would definitively decide whether OSC could exercise subpoena power over DRPA now and in the future. Thus, just as in NE Hub, DRPA's declaratory judgment action satisfies the "conclusiveness" factor of the Step-Saver test.

#### 4. **Resolution of this Declaratory Judgment Action Will be of Practical Utility to the Parties.**

"Practical utility goes to 'whether the parties' plans of actions are likely to be affected by a declaratory judgment,' Step-Saver, 912 F.2d at 649 n. 9, and considers the hardship to the parties of withholding judgment." NE Hub, 239 F.3d at 344-45. Here, as in NE Hub, it is plain that the declaratory judgment will affect the parties' actions. If the Court confirms that federal compact law precludes OSC

from issuing subpoenas to DRPA, then that will preclude OSC from further pursing the two current Subpoenas, and from issuing any additional subpoenas to DRPA in the future. As to hardship, the Third Circuit's discussion of that issue in NE Hub reiterated that being subjected to a state administrative process that is in conflict with and precluded by federal law is "hardship" for purposes of the ripeness analysis. Id. at 345-46. Thus, being subject to subpoenas from OSC, when OSC lacks authority to issue such subpoenas to DRPA, presents sufficient "hardship" for purposes of the "practical utility" analysis. DRPA's Action satisfies the "practical utility" prong of the Step-Saver test.

In sum, all three of the Step-Saver factors indicate that DRPA's Action presents an actual "case or controversy" that is ripe for adjudication.

**5. This Action Involves Different Circumstances and a Different Issue, Warranting a Different Analysis Than in *First Choice*.**

Acting Comptroller Walsh's reliance on this Court's determination in First Choice is misplaced, because that matter involved a different circumstance and different issue. There, the plaintiff's challenge was directed to the ***substance*** of the subpoena (i.e., whether the state agency was entitled to the information it sought), ***not*** whether the state agency had the ***jurisdiction and authority*** to issue any subpoena to the plaintiff. See First Choice Women's Resource Centers, Inc. v. Platkin, Civ. Act. No. 23-23076, 2024 WL 150096, *1 (D.N.J. Jan. 12, 2024). Unlike in NE Hub and the present Action, there was no issue in First Choice of

whether a federal law ***categorically preempted and precluded the state agency from pursuing an administrative process*** against the plaintiff. As discussed above, here – just as in NE Hub – the contention is that the state agency lacks authority to engage in an administrative process against DRPA, which presents a legal issue ***independent of the ultimate results of that process***. That independent legal issue of authority was not implicated in First Choice.

In sum, DRPA's Action is, for purposes of ripeness analysis, analogous to and governed by NE Hub, not First Choice.

### 6. Standing Analysis Supports that This Action Presents a Justiciable "Case or Controversy".

This Court recognized in First Choice that Article III standing is a similar justiciability doctrine that overlaps with ripeness. See id. at *4; see also MedImmune, 549 U.S. at 128 n.8 ("The justiciability problem that arises, when the party seeking declaratory relief is himself preventing the complained-of injury from occurring, can be described in terms of standing ... or ... ripeness"); Plains All Am. Pipeline L.P. v. Cook, 866 F.3d 534, 539 (3d Cir. 2017) ("because Plains is bringing a preenforcement action, the justiciability issue in this case can equally be described in terms of standing"); Free Speech Coal., Inc. v. Att'y Gen. of United States, 825 F.3d 149, 167 n.15 (3d Cir. 2016) ("[W]hether Plaintiffs have standing or their claims are ripe ... both turn on whether the threat of future harm ... is sufficiently immediate to constitute a cognizable injury.")

Another District Court recently analyzed DRPA's standing to bring a similar action seeking declaratory judgment that a state agency lacked authority to unilaterally apply state law requirements to DRPA. See Keystone Outdoor Advertising Co., Inc. v. Secretary of Pa. Dep't of Trans., Civ. A. No. 19-5951, 2022 WL 2805335, *5-*6 (E.D. Pa. July 18, 2022). Keystone involved an attempt by Pennsylvania's Department of Transportation ("PennDOT") to apply Pennsylvania laws regarding outdoor advertising in highway rights-of-way to billboards located on DRPA property. And, notably, state administrative proceedings were still ongoing, having been stayed pending the results of the declaratory judgment action in federal court.

The court rejected PennDOT's challenge to DRPA's standing:

> It is clear that the DRPA has suffered "an invasion of a legally protected interest" that is "concrete and particularized." …. Therefore, PennDOT's attempt to regulate the Billboards on DRPA property, located there pursuant to a contract between the DRPA and Keystone and in accordance with the DRPA's authorized purposes, directly impinges on the DRPA's legal rights under the Compact.
>
> Moreover, the Third Circuit has held that a plaintiff seeking declaratory relief has Article III standing if "there is such substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Constitution Party v. Aichele, 757 F.3d 347, 372 (3d Cir. 2014) (citing Khodara Env't, Inc. v. Blakey, 376 F.3d 187, 193 (3d Cir. 2004)). Here, there is a substantial controversy between PennDOT and the DRPA, both of whom are asking this Court to declare judgment as to the parties' respective rights as to enforcement of Pennsylvania's laws to the Billboards located on DRPA property. ***Clearly, under this test, the DRPA has standing and there is a "case or controversy" that is ripe for adjudication.***

Ibid. (emphasis added).

DRPA's Action is based upon the exact same principle of federal interstate compact law, and seeks the exact same declaratory and injunctive relief precluding an agency of one founder state from unilaterally imposing state law on DRPA without legislative consent of the other founder state. Just as the Keystone matter "clearly" presented a justiciable "case or controversy", this similar Action does as well.

Moreover, as with PennDOT in Keystone, ***Acting Comptroller Walsh has effectively joined in seeking this Court's resolution of the merits issue***. Acting Comptroller Walsh has moved under Rule 12(b)(6) to dismiss this Action, seeking an affirmative determination from this Court that OSC has authority to exercise subpoena power over DRPA notwithstanding DRPA's interstate compact; indeed, Acting Comptroller Walsh dedicates half of his motion brief to that merits argument. (See Def. Mov. Br. at 15-31.) With both parties asking this Court to resolve a legal issue as to whether ongoing state agency action illegally impinges on DRPA's legal right under its Compact to be free from unilateral state regulation, "***there is a 'case or controversy' that is ripe for adjudication.***" See Keystone, Civ. A. No. 19-5951, 2022 WL 2805335 at *6.

DRPA further notes that both the Eastern District of Pennsylvania and the Third Circuit Court of Appeals rendered judgment in another similar case, with neither court questioning that the matter was ripe for adjudication. See Delaware

River Joint Toll Bridge Comm'n v. Secretary Pa. Dep't of Labor & Indus., 985 F.3d 189 (3d Cir. 2021) ("DRJTBC"). There, the Delaware River Joint Toll Bridge Commission ("Bridge Commission") – another bi-state entity co-founded by New Jersey – filed suit against the Secretary of the Pennsylvania Department of Labor & Industry ("PaDLI") to obtain declaratory and injunctive relief precluding PaDLI from applying certain Pennsylvania construction code laws against the Bridge Commission. Id. at 191. The District Court granted summary judgment to the Bridge Commission, which the Third Circuit affirmed on appeal. Ibid. PaDLI had ***threatened*** a stop-work order and regulatory sanctions against the Bridge Commission's elevator contractor, but PaDLI ***had not actually taken either action***. Id. at 192. Nevertheless, both the District Court and the Third Circuit proceeded to decide the case on its merits, with no concern about its justiciability.

In short, prior decisions in similar and analogous cases overwhelmingly demonstrate that a declaratory judgment action like this one presents an actual "case or controversy" that is ripe for adjudication.

**B. DRPA's Compact Did Not Require Notice or Resolution as a Precondition to Filing this Action.**

There is no merit to Acting Controller Walsh's contention that DRPA failed to follow certain supposed mandatory prerequisites to suing set forth in the DRPA Compact. (See Def. Mov. Br. at 12-13.)

Acting Comptroller Walsh argues that before filing any lawsuit, the DRPA must first notify the Attorneys General of New Jersey and Pennsylvania, and must also obtain a resolution from the Board of Commissioners authorizing the suit. (Ibid.) Acting Comptroller Walsh purports that these requirements are specified in the DRPA Compact. (Ibid.) Tellingly, however, he does not quote the supposed source provision in full, and instead presents only snippet quotes embedded in paraphrase. Moreover, Acting Comptroller Walsh ignores other language in the DRPA Compact, through which the founder states empowered DRPA to file suit without any preconditions.

The DRPA Compact broadly grants the DRPA the power to "sue and be sued". N.J.S.A. 32:3-5; 36 P.S. § 3503 Art. IV. The DRPA Compact also broadly grants the DRPA the power

> ***[t]o exercise all other powers not inconsistent with the constitutions of the two States or of the United States, which may be reasonably necessary or incidental to the effectuation of its authorized purposes*** or to the exercise of any of the foregoing powers, except the power to levy taxes or assessments, ***and generally to exercise*** in connection with its property and affairs, and in connection with property within its control ***any and all powers which might be exercised by a natural person or a private corporation in connection with similar property and affairs***.

Ibid. (emphasis added). These provisions both broadly authorize DRPA to file lawsuits, and neither provision imposes any preconditions on that authority.

Acting Comptroller Walsh cites only the following DRPA Compact provision, which authorizes:

> Institution through its counsel, or such other counsel as it shall designate, or intervention in, ***any litigation involving rates, preferences, rebates, or other matters vital to the interest of the Port District***; provided, that notice of any such institution of or intervention in litigation shall be given promptly to the Attorney General of the Commonwealth of Pennsylvania and to the Attorney General of the State of New Jersey, and provision for such notices shall be made in a resolution authorizing any such intervention or litigation and shall be incorporated in the minutes of the Commission.

N.J.S.A. 32:3-5(i); 36 P.S. § 3503 Art. I (emphasis added).

In selectively quoting from that provision, Acting Comptroller Walsh's brief omits the crucial qualifying language specifying that the notice and resolution requirements apply ***only*** to "litigation involving rates, preferences, rebates, or other matters vital to the interest of the Port District". (See ibid.) A "preference" is a "priority in the right to demand and receive satisfaction of an obligation". See https://www.merriam-webster.com/dictionary/preference. This litigation does ***not*** involve rates, preferences, or rebates. Nor does this litigation concern "other matters vital to the interest of the Port District" as that phrase must be construed under the doctrine of ejusdem generis.

As explained and applied by the U.S. Supreme Court, ejusdem generis is a "statutory canon [providing] that '***[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words***.'" Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114-15 (2001) (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991))

(first alteration and emphasis added). See, e.g., Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 384-85 (2003) (ejusdem generis required that residual term "or other legal processes" in the statutory list "execution, levy, attachment, garnishment, or other legal process" be read "restrictively" as only including legal processes similar to those expressly listed). Ejusdem generis is "***typically used … to ensure that a general word will not render specific words meaningless***." United States v. Maurer, 639 F.3d 72, 78 (3d Cir. 2011) (internal quote omitted). In other words, courts will not read a residual clause so as to render it pointless for the preceding terms to have been specifically listed. See ibid.

Under ejusdem generis, the residual clause "other matters vital to the interest of the Port District" should be read to give meaning and effect to the foregoing terms "rents, preferences, rebates". Thus, "the residual clause … should itself be controlled and defined by reference to the enumerated categories … which are recited just before it". See Circuit City, 532 U.S. at 115. As "rents, preferences, [and] rebates" all relate to financial payment rights and obligations, "other matters vital to the interest of the Port District" should be read as including only matters relating to important ***financial payment rights or obligations*** of DRPA. Whether OSC has authority to issue subpoenas to DRPA – an issue that does not involve financial payment rights/obligations – clearly does ***not*** fall into that category. Nor could that issue (despite its importance to DRPA) plausibly be viewed as "vital" to

Port District interests, given that it does not impact DRPA's core functions – operation of the DRPA bridges and PATCO transit system.

DRPA notes, finally, that DRPA's CEO advised the DRPA's Board of Commissioners of the filing of this Action in the CEO's report at the Board's next monthly meeting in August 2024, and the CEO's report was then approved by a unanimous vote of all attending Commissioners from both founder states. (See SUMF at ¶ 36.) So, any insinuation that this Action has not been approved by DRPA's Board of Commissioners is baseless.

In sum, Acting Comptroller Walsh's contention that the Court should dismiss this Action as unauthorized under the DRPA Compact is without merit.

### C. As a Suit Against a State Official for Violation of Federal Law, DRPA's Action is Proper Under *Ex parte Young*.

Acting Comptroller Walsh's contention that DRPA's Action is barred by Eleventh Amendment immunity is likewise meritless. That contention is based upon a strawman argument ***inaccurately characterizing*** DRPA's Action as asserting a "state-law claim that that the Comptroller violated the OIG or Comptroller Statutes in issuing the subpoenas". (See Def. Mov. Br. at 13.) DRPA's Complaint asserts no such state law claim.

DRPA contends that Acting Comptroller Walsh's issuance of the Subpoenas to DRPA violated the DRPA Compact and federal law governing interstate compacts. (See Compl. at ¶ 74.) Once Congress approves an interstate compact, it

becomes "the law of the Union," Delaware River Joint Toll Bridge Comm'n v. Colburn, 310 U.S. 419, 427 (1940), the interpretation of which is a matter of federal law. Cuyler v. Adams, 449 U.S. 433, 440 (1981).

The Third Circuit Court of Appeals recently ***rejected*** a similar Eleventh Amendment immunity argument in a similar action by another bi-state entity – the Bridge Commission. See, DRJTBC, 985 F.3d at 193-94. There, the Bridge Commission filed suit against the Secretary of the PaDLI to obtain declaratory and injunctive relief precluding the PaDLI from unilaterally applying certain Pennsylvania construction code laws and regulations against the Bridge Commission. Ibid. Relying upon Ex parte Young, 209 U.S. 123 (1908), the Third Circuit rejected the defendant's Eleventh Amendment argument, explaining:

> Under a federal court's equitable powers, however, there is an important exception to this general rule: in certain circumstances, a plaintiff may bring a federal suit against state ***officials***. See Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In such cases, state officials are stripped of their official or representative character and thereby deprived of the State's immunity when they commit an ongoing violation of federal law.
>
> …. It requires us to "conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law" and whether it "seeks relief properly characterized as prospective." Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (cleaned up).
>
> The terms of the Compact adopted by Congress are federal law. See Operating Eng'rs, 311 F.3d at 275. By alleging the Secretary's actions would violate the Compact the Commission has alleged an ongoing violation of federal law.

> The relief sought by the Commission—a declaration as to Pennsylvania's power to regulate the Scudder Falls Administration Building—is prospective. Just as the injunction upheld in Ex parte Young enjoined the Attorney General of Minnesota to conform his conduct with federal law (the Fourteenth Amendment), the relief sought here likewise requires the Secretary to conform his conduct to federal law (the Compact). See Ex parte Young, 209 U.S. 123, 145, 28 S.Ct. 441, 52 L.Ed. 714. In sum, the Commission's suit seeks prospective relief to prevent an ongoing violation of federal law by the Secretary. It falls squarely within the Ex parte Young exception to sovereign immunity.

DRJTBC, 985 F.3d at 193-94.

The Third Circuit's reasoning applies equally here. By seeking declaratory and injunctive relief as to Acting Comptroller Walsh's authority to subpoena DRPA under New Jersey statutory law, DRPA is seeking prospective relief to prevent an ongoing violation of federal law (the DRPA Compact) by Acting Comptroller Walsh. Just like the Bridge Commission's suit in DRJTBC, the DRPA's Action "falls squarely within the Ex parte Young exception to sovereign immunity". See id. at 194.

## III. SUBPOENA POWER CONFERRED ON THE OSC CANNOT BE APPLIED TO DRPA WITHOUT PENNSYLVANIA'S CONSENT.

Ultimately, Acting Comptroller Walsh's motion to dismiss should be denied, and DRPA's cross-motion for summary judgment should be granted, because as a matter of law subpoena power conferred by New Jersey statute on the OSC cannot be unilaterally exercised against DRPA, i.e., without Pennsylvania's legislative consent. Bi-state entities like the DRPA are not subject to unilateral regulation by

either of the founder states, except in specific, limited circumstances where consent to such unilateral regulation has been mutually provided by both founder states.

### A. Interstate Entities Are Created Through Congressionally-Approved Compacts Between States.

Interstate entities like DRPA derive their existence and authority from an interstate compact between the compacting states, approved by the U.S. Congress. Congressional approval of interstate compacts is required pursuant to the "Compact Clause" of the U.S. Constitution, which mandates that "[n]o State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State." U.S. Const. art. I, § 10, cl. 3. As a result, "[b]istate entities occupy a significantly different position in our federal system than do the States themselves. The States, as separate sovereigns, are the constituent elements of the Union. Bistate entities, in contrast, typically are creations of three discrete sovereigns: two States and the Federal Government." Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 40 (1994).

Interstate entities' "mission is to address interests and problems that do not coincide nicely either with the national boundaries or with State lines – interests that may be badly served or not served at all by the ordinary channels of National or State political action." Ibid. (internal quote marks removed). Interstate entities facilitate streamlined, efficient management of regional issues that impact adjacent states. DRPA, for example, owns, operates, and maintains certain bridges crossing

the Delaware River between New Jersey and Pennsylvania, as well as the PATCO Speedline urban transit system that transports passengers between Philadelphia and Camden County, New Jersey. See History of DRPA, available at https://www.drpa.org/about/history.html. Formation of an interstate entity to manage such regional issues allows for a unified approach, ensuring that the compacting states act consistently on issues of common interest. And, it avoids the burden and delay of the founder states having to formally negotiate every issue on an individual basis.

**B. Interstate Entities are Created Through the Founder States' Surrender of a Portion of their Sovereign Authority.**

Creation of an interstate entity involves a ***surrender*** by each compacting state of a ***portion of its sovereign authority***. "'An interstate compact, by its very nature, ***shifts a part of a state's authority to another state or states, or to the agency the several states jointly create to run the compact***.'" Hess, 512 U.S. at 42 (quoting M. Ridgeway, Interstate Compacts: A Question of Federalism 300 (1971)) (emphasis added). "***Bistate entities thus are not 'extensions of each compacting state's authority***,' but are instead formed through ***each state's surrender of a portion of its sovereignty to the compact entity***." Spence-Parker v. Delaware River & Bay Auth., 616 F. Supp.2d 509, 515 (D.N.J. 2009) (quoting International Union of Operating Eng'rs, Local 542 v. Delaware River Joint Toll Bridge Comm'n, 311 F.3d 273, 276 (3d Cir. 2002)) (emphasis added). "By

compacting together to form [an interstate entity], ***New Jersey and Pennsylvania have each surrendered a portion of their sovereignty*** over certain Delaware River bridge operations in order to better serve the regional interest." Int'l Union of Operating Eng'rs, 311 F.3d at 276 (emphasis added). Having surrendered a portion of its sovereignty to create DRPA, New Jersey cannot now exercise that sovereignty over DRPA.

The surrender of sovereignty does not mean that interstate entities are fully independent. Compacting states jointly and cooperatively direct an interstate entity's actions through (1) equal representation on a board of commissioners; and (2) in some instances, veto power available to the Governors of the compacting states. (See, e.g., DRPA Compact at Arts. II & III; 36 P.S. § 3505.1.) A compacting state desiring to influence an interstate entity's management, decisions, and actions must work through these internal mechanisms, established by the entity's compact, rather than through unilateral application of state laws.

**C. Bi-State Entities Are Not Subject to Unilateral Imposition of Duties by Either of the Founder States.**

"'[C]ompact agencies and entities are said to exist in a no-man's land. They lie somewhere in the space between independent and dependent, sovereign and subject, state and federal.'" Spence-Parker, 616 F. Supp.2d at 516 n.6 (quoting Matthew S. Tripolitsiotis, Bridge Over Troubled Waters: The Application of State Law to Compact Clause Entities, 23 Yale L. & Pol'y Rev. 163, 167 (2005)); see

also Brust v. ACF Industries, LLC, Civil Action No. 11–4839, 2011 WL 6756921, *3 (D.N.J. Dec. 21, 2011). "Thus, ***bistate entities are 'beholden neither to the states, since they gave up sovereignty for efficiency's sake***, nor to Congress, since, once approved, Congress has no more executory powers over compact entities than it does over any private corporation.'" Brust, 2011 WL 6756921, *3 (quoting 23 Yale L. & Pol'y Rev. at 181) (emphasis added).

Stated differently, in the words of the U.S. Supreme Court, "***bistate entities created by compact . . . are not subject to the unilateral control of any one of the States***.'" Hess, 513 U.S. at 42 (emphasis added); see also Int'l Union of Operating Eng'rs, 311 F.3d at 276-79; Delaware River Port Auth. v. Fraternal Order of Police, 135 F. Supp.2d 596, 604 (E.D. Pa. 2001), rev'd on other grounds, 290 F.3d 567 (3d Cir. 2002). In short, DRPA's special nature as a bi-state entity precludes DRPA from being regulated through legislation or regulations adopted unilaterally by either one of the founder states.

Imposition of one founder state's laws or regulations on a bi-state entity is permissible only in two circumstances: (1) when the compact creating the bi-state entity expressly authorizes unilateral regulation on a particular subject; or (2) when the interstate compact authorizes imposition of additional duties through legislation of one founder state "concurred in" through legislation of the other state. See Int'l Union of Operating Eng'rs, 311 F.3d at 276-79.

### D. The Founder States Have Not Consented to Application of New Jersey Law Governing OSC Investigations to DRPA.

Neither of the two kinds of consent for unilateral regulation exist here. The DRPA Compact does ***not*** expressly authorize the application of New Jersey's laws relating to OSC investigations to DRPA. See generally N.J.S.A. 32:3-1, et seq.; 36 P.S. § 3503. And while the DRPA Compact provides that DRPA "shall also have such additional powers as may hereafter be delegated to or imposed upon it from time to time by the action of either State concurred in by legislation of the other," N.J.S.A. 32:3-5; 36 P.S. § 3503 (DRPA Compact Art. IV), Pennsylvania has ***not*** enacted legislation concurring in the application of New Jersey laws relating to OSC investigations to DRPA. Thus, under the DRPA Compact and the federal law governing interpretation of interstate compacts, Acting Comptroller Walsh lacks authority to apply his subpoena power against the DRPA.

### E. Surrenders of Sovereignty Are Not Limited Only to Subjects Expressly Mentioned in the Compact.

Acting Comptroller Walsh argues that the DRPA Compact provisions authorizing and requiring DRPA to engage in certain self-auditing and reporting functions do not provide an express surrender of New Jersey's sovereign authority to unilaterally compel cooperation with OSC investigations. (Def. Mov. Br. at 24-25.) Acting Comptroller Walsh attempts to draw a distinction between authority and powers enumerated in Articles I and IV of the DRPA Compact, versus authority granted in later provisions (DRPA's self-auditing and reporting functions

are described in Article XII). (Ibid.) However, that argument is a red herring. It is founded on the ***false premise*** that any surrender of sovereignty must be specifically, affirmatively expressed on the face of a compact. Acting Comptroller Walsh's argument misunderstands DRPA's position and ignores Third Circuit law.

**1. DRPA's Sovereign Right to be Free from Unilateral New Jersey Regulation is Independent of the Self-Audit Language in the DRPA Compact.**

First, DRPA does ***not*** rely on the DRPA Compact provisions authorizing and directing DRPA to perform certain periodic self-audits and reports to the founder states' Governors as being an express, specific surrender of New Jersey's authority to subpoena DRPA. DRPA makes no such contention. This is another instance of Acting Comptroller Walsh setting up a strawman argument. The relevance of the self-audits and reporting provision in Article XII of the DRPA Compact is simply as confirmation that the founder states did not ***reserve*** investigatory/subpoena authority. As will be discussed below, the Third Circuit has repeatedly held that the act of creating an interstate compact entity accomplishes an extremely broad surrender of sovereign authority, limited only by the founder states' ***express reservations***.

**2. Founder States' Surrender of Sovereignty Extend Far Beyond Topics Specifically Mentioned in their Compact.**

Acting Comptroller Walsh argues that the absence of clear, express language in the DRPA Compact specifically addressing external investigations by state government agencies means that New Jersey cannot be deemed to have

surrendered sovereignty on that subject matter. (Def. Mov. Br. at 24.) However, that line of argument has been expressly rejected the Third Circuit Court of Appeals, and is contrary to how interstate compact law has been applied by many courts over many decades.

The Third Circuit Court of Appeals recently affirmed that Pennsylvania could not apply its building codes to construction being performed in Pennsylvania by the Bridge Commission. See DRJTBC, 985 F.3d at 196. PaDLI contended that the Bridge Commission had to comply with regulations implementing Pennsylvania's Uniform Construction Code, including those relating to elevator inspections and fuel storage. Id. at 192. The Court of Appeals affirmed the District Court's grant of summary judgment to the Bridge Commission. Id. at 196.

Although the Bridge Commission's compact does not specifically address construction codes, the Third Circuit found that the compacting states' broad surrender of sovereign authority to the Bridge Commission with respect to its affairs, projects, and properties prevented Pennsylvania from unilaterally applying its construction code law to the Bridge Commission. Id. at 195-96. The Court found the Bridge Commission's compact to be an "expansive" and "unambiguous surrender" by New Jersey and Pennsylvania of their sovereign authority over the subject matter of the compact, through which they "'***relinquished all control over the [Bridge Commission] unless otherwise stated in the compact***.'" Id. at 195

(quoting HIP Heightened Indep. & Progress, Inc. v. Port Auth. of N.Y. & N.J., 693 F.3d 345, 358 (3d Cir. 2012)) (emphasis added).

The Third Circuit cited in DRJTBC to its prior decision in Int'l Union of Op. Eng'rs, 311 F.3d at 281, where the court held that neither New Jersey nor Pennsylvania collective bargaining laws applied to the Bridge Commission. The DRJTBC court summarized: "We refused '[t]o read into the Compact any collective bargaining requirements' ***because the Compact's silence as to the authority of the States to enforce such laws did not amount to a grant of permission***." DRJTBC, 985 F.3d at 195 (quoting Int'l Union of Op. Eng'rs, 311 F.3d at 281) (emphasis added).

The DRJTBC court also cited to its prior decision in HIP, 693 F.3d at 358, in which the Third Circuit had held that New Jersey's civil rights and construction code statutes were not applicable to the Port Authority of N.Y. & N.J., despite that those subject matters were not expressly addressed in that bi-state entity's compact:

> We declined to enforce New Jersey's statutes against the Port Authority even though the Compact lacked an "express surrender of state sovereignty regarding external relations." Id. at 358. Such an argument, we held, "misapprehends the notion of sovereignty surrender" discussed by the Supreme Court in Hess and this Court in Operating Engineers. Id. ***Although "court[s] must be hesitant to find a surrender of sovereignty where it is ambiguous," the creation of a bi-state entity pursuant to the Compact Clause is an unambiguous surrender.*** Id. "***By expressly creating the bi-state entity, [the compacting States] relinquished all control over the [entity] unless otherwise stated in the compact***." Id.

Ibid. (quoting HIP, 693 F.3d at 358) (alterations in original) (emphasis added).

The Third Circuit observed that Pennsylvania could have included in the bi-state compact a provision reserving to itself police power to regulate Bridge Commission construction activities on Commonwealth soil, similar to the explicit reservations in the compact for taxation and exercise of eminent domain authority. Id. at 196. Not having done so, Pennsylvania could not now unilaterally require the Bridge Commission to comply with Pennsylvania construction code laws and regulations. Ibid. The court admonished that "[t]o interpret the Compact otherwise would be to rewrite the [compact] agreement between the two states without any express authorization to do so." Id. at 195.[2]

A district court, following the same reasoning, recently ruled that PennDOT could not apply Pennsylvania laws regarding outdoor advertising in highway rights-of-way to billboards located on DRPA property. Keystone, Civ. A. No. 19-5951, 2022 WL 2805335 at *9. The Secretary of PennDOT argued that billboard advertising is not one of DRPA's authorized functions or powers specifically listed in Articles I and IV of the DRPA Compact. See id. at *6. However, the court rejected the Secretary of PennDOT's argument that such silence regarding

[2] The New Jersey Supreme Court relied upon these Third Circuit decisions when it ruled just a few months ago that New Jersey and Pennsylvania had surrendered their sovereignty regarding whether the Bridge Commission could use project labor agreements, despite that the Bridge Commission's compact was silent regarding project labor agreements. See Delaware River Joint Toll Bridge Comm'n v. George Harms Constr. Co., Inc., 258 N.J. 286, 305-07, 309 (2024).

billboards meant that DRPA leasing space to billboard operators fell outside of the compacting states' broad surrender of authority. Id. at *6-9. The court reiterated that "***[w]hen a bi-state entity is created pursuant to the Compact Clause, there is presumed to be an unambiguous surrender of state sovereignty to that entity. By creating a bi-state entity, the states relinquish all control over the entity unless expressly reserved in the compact***." Id. at *17 (citations omitted) (emphasis added).

In short, Third Circuit courts have made clear that an interstate compact need not specifically address a particular issue for sovereignty over that issue to have been surrendered. Rather, the creation of an interstate entity effects a complete, unambiguous surrender of sovereignty and control over everything within the interstate entity's ambit, except as specifically and expressly reserved in the interstate compact. Thus, contrary to Acting Comptroller Walsh's argument, DRPA need not establish that the DRPA Compact expressly and specifically addresses external investigations by state government agencies. Instead, the burden rests on Acting Comptroller Walsh to show a specific, express reservation in the DRPA Compact for New Jersey to unilaterally exercise investigatory and subpoena power over DRPA. Acting Comptroller Walsh has failed to satisfy that burden.

### 3. The DRPA Compact Contains No Reservation of Authority for New Jersey OSC Investigations.

Although the DRPA Compact contains express reservations of New Jersey's authority with respect to subjects like taxation and eminent domain, see N.J.S.A. 32:3-5, -6; 36 P.S. § 3503 (Art. IV(n); Art. V), it does ***not*** reserve to New Jersey the authority to exercise subpoena power to compel DRPA compliance with OSC investigations. (See generally DRPA Compact.) As noted above, the only mention in the DRPA Compact of any kind of auditing or investigation of DRPA operations provides for DRPA to conduct periodic ***self***-auditing and ***self***-reporting to the Governors of the founder states. (See id. at Art. XII.)

Just as the Third Circuit observed in DRJTBC, if New Jersey wanted to reserve authority to exercise subpoena power to compel DRPA compliance with OSC investigations, then New Jersey could have bargained for that authority and included it in the DRPA Compact. New Jersey did not do so. New Jersey cannot now exercise authority it failed to retain when it relinquished sovereignty to DRPA.

Acting Comptroller Walsh argues that provisions in the DRPA Compact (1) providing the founder state Governors with veto power over DRPA Board of Commissioner actions, and (2) requiring the Governors' approval for DRPA rulemaking, demonstrate an intent to maintain state oversight over DRPA

operations, and thus evidence a reservation of New Jersey's authority to investigate DRPA. However, that argument is a non sequitur.

It does ***not*** follow that the founder states' negotiated inclusion in the DRPA Compact of two very specific, limited reservations of oversight authority demonstrates an intent to also broadly reserve all other oversight authority. Such an argument is contrary to logic; if such a broad reservation was the founding states' mutual intent, then surely they would have said so instead of just including two specific, limited reservations. Acting Comptroller Walsh's argument is also contrary to the clear Third Circuit law discussed above, which holds that creation of an interstate compact entity achieves a complete surrender of sovereign authority except as ***expressly*** reserved in the compact. See, e.g., DRJTBC, 985 F.3d at 195; HIP, 693 F.3d at 358; Keystone, Civ. A. No. 19-5951, 2022 WL 2805335 at *17.

### F. Arguments About the Language and Purpose of the N.J. Statutes Granting OSC Subpoena Power are Misfocused.

Acting Comptroller Walsh argues extensively that DRPA falls within the ambit of entities that the OSC is statutorily empowered to investigate, either because DRPA has received some state grant money, or because DRPA supposedly is an "independent authority" as that term is used within the statute provisions upon which Acting Comptroller Walsh relies. (See Def. Mov. Br. at 15-23.) Those arguments are misfocused. Whether the New Jersey statute provisions

on which Acting Comptroller Walsh relies plausibly could be read broadly enough to encompass DRPA does not matter. New Jersey ***cannot*** unilaterally apply its laws against a bi-state entity like the DRPA. See, e.g., Hess, 513 U.S. at 42. Even if the New Jersey legislature intended the OSC's investigatory and subpoena powers to extend to DRPA, such intent would ***not be effective absent legislative concurrence from the other founder state***. See, e.g., Int'l Union of Operating Eng'rs, 311 F.3d at 276-79. Pennsylvania has ***not*** passed any law consenting to the OSC being authorized and empowered to subpoena DRPA.[3]

Acting Comptroller Walsh also argues that the statutes empowering the OSC must be found applicable to DRPA to avoid "undermining accountability". (Def. Mov. Br. at 29.) Acting Comptroller Walsh argues that his role in providing "independent oversight" is of critical importance to prevent breaches of public trust and protect the public fisc. (Id. at 16.) That argument is, again, misfocused. Regardless of the importance of the purpose and policy of a particular New Jersey law, it cannot be unilaterally applied against a bi-state entity like the DRPA.

Statutes like New Jersey's Law Against Discrimination ("LAD") and Conscientious Employee Protection Act ("CEPA"), and statutes imposing construction codes or promoting competitive bidding for public projects, all have

---

[3] Had such legislative consent existed, the founder states' Governors would not have had to request DRPA to ***voluntarily invite*** OSC to conduct an audit of DRPA's operations in 2010. (See SUMF at ¶ 21.)

important salutary purposes. But courts have held that those statutes do ***not*** apply to DRPA or other interstate entities, based upon the principle that the founder states cannot unilaterally apply their laws to an interstate entity. See, e.g., HIP, 693 F.3d at 358 (LAD and New Jersey construction code not applicable to the Port Auth. of N.Y. & N.J); Int'l Union of Op. Engrs., 311 F.3d at 275 (collective bargaining laws not applicable to Bridge Commission); Spence-Parker, 616 F. Supp.2d at 520 (CEPA and LAD not applicable to Delaware River & Bay Auth.). In other words, that a particular statute has an important, salutary purpose does ***not*** exempt it from the overarching, fundamental principle of interstate compact law precluding a founder state's unilateral application of its law to a bi-state entity.

By asking the Court to enforce the Subpoenas, Acting Comptroller Walsh is essentially asking the Court to rewrite an agreement that was bargained for by the two founder states, codified into statute by their respective legislatures, and ratified by the U.S. Congress. As the Third Circuit admonished in DRJTBC, such a request is improper. See DRJTBC, 985 F.3d at 195.

## **CONCLUSION**

For the foregoing reasons, DRPA respectfully requests that the Court (1) deny Acting Comptroller Walsh's motion to dismiss, and (2) grant DRPA's cross-motion for summary judgment on its declaratory judgment claim.

Respectfully submitted,

ARCHER & GREINER
A Professional Corporation
Attorneys for Plaintiff
By: *s/ Christopher R. Gibson*
Christopher R. Gibson, Esq.
(Attorney #029861985)
Patrick M. Flynn, Esq.
(Attorney #020141995)

Dated: November 18, 2024

229589266 v1